UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF INDIANA
TERRE HAUTE DIVISION

| | | |
|---|---|---|
| HENRY TYWAN MCMULLEN, SR., | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | No. 2:20-cv-00343-JRS-MG |
| | ) | |
| D. BEDWELL, | ) | |
| B. SMITH, | ) | |
| | ) | |
| Defendants. | ) | |

**ORDER GRANTING DEFENDANTS' MOTION FOR SUMMARY
JUDGMENT AND DIRECTING ENTRY OF FINAL JUDGMENT**

Plaintiff Henry Tywan McMullen, Sr., an inmate at Wabash Valley Correctional Facility

("Wabash Valley"), brought this 42 U.S.C. § 1983 action alleging that Food Service Director

Daniel Bedwell and Assistant Food Service Director Brittany Smith[1] were deliberately indifferent

to his health and safety because, on two occasions, he was served rotten eggs and, on one occasion,

he was served a moldy orange. Defendants have moved for summary judgment. Dkt. 34. For the

reasons below, the motion is **granted**.

**I.**
**Standard of Review**

Parties in a civil dispute may move for summary judgment, which is a way of resolving a

case short of a trial. *See* Fed. R. Civ. P. 56(a). Summary judgment is appropriate when there is no

genuine dispute as to any of the material facts, and the moving party is entitled to judgment as a

matter of law. *Id.*; *Pack v. Middlebury Comm. Sch.*, 990 F.3d 1013, 1017 (7th Cir. 2021). A

"genuine dispute" exists when a reasonable factfinder could return a verdict for the nonmoving

---

[1] In his complaint, Mr. McMullen identified Defendants as "D. Bedwell" and "B. Smith." The **clerk
is directed** to update the docket to reflect their proper names.

party. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). "Material facts" are those that might affect the outcome of the suit. *Id.*

When reviewing a motion for summary judgment, the Court views the record and draws all reasonable inferences from it in the light most favorable to the nonmoving party. *Khungar v. Access Cmty. Health Network*, 985 F.3d 565, 572-73 (7th Cir. 2021). It cannot weigh evidence or make credibility determinations on summary judgment because those tasks are left to the fact-finder. *Miller v. Gonzalez*, 761 F.3d 822, 827 (7th Cir. 2014). The Court is only required to consider the materials cited by the parties, *see* Fed. R. Civ. P. 56(c)(3); it is not required to "scour every inch of the record" for evidence that is potentially relevant. *Grant v. Tr. of Ind. Univ.*, 870 F.3d 562, 573-74 (7th Cir. 2017).

"[A] party seeking summary judgment always bears the initial responsibility of informing the district court of the basis for its motion, and identifying those portions of 'the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any,' which it believes demonstrate the absence of a genuine issue of material fact." *Celotex Corp. v. Catrett,* 477 U.S. 317, 323 (1986). "[T]he burden on the moving party may be discharged by 'showing'—that is, pointing out to the district court—that there is an absence of evidence to support the nonmoving party's case." *Id*. at 325.

## II.
## Factual Background

Because Defendants have moved for summary judgment under Rule 56(a), the Court views and recites the evidence "in the light most favorable to the non-moving party and draw[s] all

reasonable inferences in that party's favor." *Zerante v. DeLuca*, 555 F.3d 582, 584 (7th Cir. 2009) (citation omitted).[2]

Aramark is a private company that contracts with the Indiana Department of Correction ("IDOC") to supply food services at Wabash Valley. Declaration of Daniel Bedwell, dkt. 36-2 ¶ 4. Under the contract, Aramark serves diabetic meals, which are also known as "2200 diabetic meals." *Id.* ¶ 7. Such diabetic meals are approved by the IDOC and ordered by medical staff. *Id.* They are reviewed and approved by registered dieticians employed by Aramark. *Id.* The diabetic meals are based upon diets approved by The Academy of Nutrition and Diabetics and provide for adequate levels of protein, Vitamin A, Vitamin C, calcium, and iron, with an appropriate snack and nutritional supplements if needed. *Id.* The 2200 diabetic meal at Wabash Valley provides inmates with about 2200 calories per day. *Id.*

At all relevant times, Director Bedwell was employed by Aramark as the Food Service Director at Wabash Valley. *Id.* ¶ 3. Director Bedwell oversees the daily food service at Wabash Valley, including the preparation of daily meals. *Id.* ¶ 5. Director Bedwell also ensures that the daily meals comply with Aramark's contract with the IDOC, including the 2200 diabetic meals. *Id.* ¶ 7. Director Bedwell does not prepare the food on a daily basis, but he regularly spot checks the prepared meals to ensure proper preparation and safety. *Id.* ¶ 6.

---

[2] The Court notes that Mr. McMullen's response was not made under penalty of perjury. Dkt. 40. Nonetheless, in the response, he makes a number of factual statements that are not supported by citations to other record evidence—for example, he states that: (1) Defendants "sometimes stand out in the area where prisoners pick their food trays. Both defendants are aware of numerous prisoners complaining regarding spoiled food, not just the day in question", *id.* at 1; (2) "those eggs are a majority of my food trey/calories," *id.* at 2; and (3) "[Wabash Valley] food serve have numerous complaint's regarding how food is being served: Missing sides, Rocks, and miscellaneous items found in food, but mostly spoiled food," *id.* (errors in original). Unsworn statements do not satisfy the requirements of Federal Rule of Civil Procedure 56(c)(4) that summary judgment materials be "made upon personal knowledge" and "set out facts that would be admissible in evidence." *See Collins v. Seeman*, 462 F.3d 757, 760 n.1 (7th Cir. 2006). And the Court is not obliged to scour the record attempting to find evidence that might support these statements. *See Grant*, 870 F.3d at 573–74. Thus, the Court has not considered such statements in preparing this factual summary.

Director Bedwell is aware of intermittent complaints about food issues, but he is not aware of a widespread issue at Wabash Valley regarding rotten eggs or rotten fruit being served to inmates. *Id.*¶ 12. The hard-boiled eggs for the diabetic meals are all cooked at the same time, in a single morning batch. *Id.* Director Bedwell was not made aware of a batch of spoiled eggs that was served, nor was he made aware that a batch of spoiled fruit was served. *Id.* Thus, he believes that, if Mr. McMullen received some bad eggs or a bad orange, the events were isolated. *Id.*

At all relevant times, Assistant Director Smith was employed by Aramark as the Assistant Food Service Director at Wabash Valley. *Id.* ¶ 3. Her responsibilities are nearly identical to Director Bedwell's with respect to inmate food preparation and oversight. *Id.* Like Director Bedwell, she performs regular spot checks of food to confirm that it is being prepared safely and according to instruction. *Id.*¶ 6.

IDOC has a policy through which inmates can request a replacement tray if they receive one that is unsatisfactory. *Id*. ¶ 10. Under this policy (the "Tray Replacement Policy"), complaints about the food trays are brought to correctional officers employed by IDOC. *Id*. ¶ 11. After a complaint, the correctional officer inspects the tray to confirm the inmate's complaint. *Id.* If the correctional officer agrees that the inmate's complaint is valid, the correctional officer issues a new tray to the inmate. *Id.*

In his complaint, Mr. McMullen complained about three instances in which he received inadequate food. At his deposition, he described the incidents and his complaints about them as follows:

On March 6, 2020, he went to the prison's infirmary before breakfast. Deposition of Henry McMullen, dkt. 36-1 at  11. He did this because he is diabetic and must receive an insulin shot before he eats breakfast. *Id.* He received his breakfast tray at the hospital and took it back to the

4

cell house to eat. *Id.* at 11–12. The tray included two hard-boiled eggs still in their shells. *Id.* at 11. He took the eggs to the common area to heat them up. *Id.* at 12. When he peeled them, he saw a "runny brown liquid" with a "foul smell to it" coming out of the eggs. *Id.* at 10, 12. He did not eat the eggs, but he showed them to several correctional officers and some nurses and was told that he needed to take the issue up with Aramark. *Id.* at 13, 18, 19. He saved the eggs for several hours because he wanted to get pictures of them to use as evidence, but no pictures were ever taken. *Id.* at 21–22.

When he went to get his lunch tray, Mr. McMullen saw Assistant Director Smith and told her that he received two rotten eggs on his breakfast tray. *Id.* at 16. Assistant Director Smith told him to give her the eggs. *Id.* He told her that he was going to keep the eggs so he could take pictures of them, and she became upset and walked away. *Id.* at 16–17.

After Mr. McMullen talked to Assistant Director Smith, he took his lunch tray. *Id.* at 16, 20. That tray included a "rotten" orange with "green and black mold" on it. *Id.* at 20. Mr. McMullen did not eat the orange or even try to peel it. *Id.* at 21.

Mr. McMullen filed a grievance about the food he received on March 6, 2020. *See* dkt. 40-1 at 53. Director Bedwell replied that staff had adequate training and that he "tried to resolve the issue the day that it happened and you refused to have a conversation with me." *Id.* That statement was untrue because Mr. McMullen never spoke to Director Bedwell—instead, he spoke to Assistant Director Smith. Dkt. 36-1 at 14.

Six weeks later—on April 17, 2020, Mr. McMullen picked up another breakfast tray at the hospital after receiving his insulin shot. *Id.* at 22. Again, his tray included two hard-boiled eggs that had a "brown liquid leaking out of them" and a "bad smell to them." *Id.* at 27–28. He did not eat the eggs. *Id.* at 31.

Mr. McMullen has never asked to see a doctor because of issues related to the spoiled food that he received. *Id.* at 31.

## III.
## Discussion

Mr. McMullen was a convicted prisoner at all relevant times. This means that the Eighth Amendment applies to his claims. *Estate of Clark v. Walker*, 865 F.3d 544, 546, n.1 (7th Cir. 2017) ("the Eighth Amendment applies to convicted prisoners"). The Eighth Amendment "standard encompasses both an objective and subjective element: (1) the harm that befell the prisoner must be objectively, sufficiently serious and a substantial risk to his or her health or safety, and (2) the individual defendants [must be] deliberately indifferent to the substantial risk to the prisoner's health and safety." *Eagan v. Dempsey*, 987 F.3d 667, 693 (7th Cir. 2021) (internal quotation omitted); *Farmer v. Brennan*, 511 U.S. 825, 837 (1994). Minor injuries do not satisfy the objective component of an Eighth Amendment claim. *See Lord v. Beahm*, 952 F.3d 902, 905 (7th Cir. 2020).

With respect to food, prisoners are entitled to meals that meet minimum caloric and nutritional requirements. *Smith v. Dart*, 803 F.3d 304, 311–12 (7th Cir. 2015). Prison officials "must provide inmates with nutritionally adequate food that is prepared and served under conditions which do not present an immediate danger to [their] health and well-being[.]" *Id*. at 312 (cleaned up). While the Eighth Amendment does not mandate comfortable prisons, it also does not permit inhumane ones. *See Prude v. Clarke*, 675 F.3d 732, 734 (7th Cir. 2012) ("Deliberate withholding of nutritious food or substitution of tainted or otherwise sickening food, with the effect of causing substantial weight loss, vomiting, stomach pains, … or other severe hardship, would violate the Eighth Amendment."). But prisoners are not entitled to "food that is tasty or even appetizing. Indeed, routine discomfort is part of the penalty prisoners pay for their offenses, and

6

prisoners cannot expect the amenities, conveniences, and services of a good hotel." *Williams v. Berge*, 102 F. App'x 506, 507 (7th Cir. 2004) (cleaned up).

In their motion for summary judgment, Defendants argue that Mr. McMullen has failed to show that the alleged deficiencies in his meals posed a substantial risk of serious harm to him, and that even if he had made such a showing, he cannot show that they acted with deliberate indifference toward his health. *See* dkt. 35 at 7–12.  For the reasons below, the Court agrees.

First and foremost, Mr. McMullen has failed to designate any evidence from which a reasonable jury could infer that he faced any risk to his health that would amount to an objectively serious constitutional deprivation. Here, Mr. McMullen does not take issue with the overall adequacy of the "2200 diabetic" meals he received. Instead, he complains that he twice received rotten eggs and once received a moldy orange. But it is undisputed that Mr. McMullen did not eat the eggs or the orange and that he never sought any medical treatment in connection with the spoiled food he received. As a result, he has failed to show that he suffered an objectively serious threat to his health or safety. *See Jaros v. Ill. Dep't of Corr.*, 684 F.3d 667, 671 (7th Cir. 2012) (noting that extent, duration, and consequences are relevant in determining whether deprivation occurred); *see also Gregory v. Bedwell*, 2:19-cv-399-JMS-MG, 2021 WL 4355386, at *3 (S.D. Ind. Sept. 24, 2021) (finding no objectively serious condition caused by lack of safe or adequate food where plaintiff complained about five problems with his meals—a staple in his potatoes, saliva on his hamburger bun, a small portion of breakfast bake, beef stroganoff that smelled bad, and a sludge-like substance in his coffee).

In his unverified response, Mr. McMullen insists that he can show that he was harmed because he could not eat all the food on his tray on the three occasions when he was served spoiled food. As a result, he did not receive his entire caloric allotment, was hungry, and was unable to go

7

to recreation. *See* dkt. 40 at 7–8. He also notes that, as a diabetic, he must eat a certain number of calories to maintain his health. *Id.* at 7. Mr. McMullen's response was not made under penalty of perjury, and he cannot rely on it to avoid summary judgment. *See Collins*, 462 F.3d at 760 n.1. Regardless, even if the Court does consider the statements in the response, there is no evidence in the summary judgement record that being deprived of the calories associated with two hard-boiled eggs and an orange on one day and two hard-boiled eggs on another day more than a month later negatively impacted Mr. McMullen's health. And, while Mr. McMullen may have been hungry for several hours on March 6 and April 17, 2020, deprivations must be extreme to violate the Eighth Amendment. *See   Giles v. Godinez*, 914 F.3d 1040, 1051 (7th Cir. 2019) ("According to the Supreme Court, however, extreme deprivations are required to make out a conditions-of-confinement claim.") (cleaned up). Given the relatively small amount of food that Mr. McMullen was unable to eat, he simply has not come forward with evidence from which a reasonable jury could infer that he was subjected to an objectively serious deprivation. *Cf. Jaros*, 684 F.3d at 671 (upholding dismissal of conditions of confinement claim and stating, "Jaros also alleges that he sometimes missed the morning meal because he could not walk fast enough to the cafeteria using only his cane without hallway railing, but he does not allege that occasionally skipping breakfast endangered his health."); *Palmer v. Johnson*, 193 F.3d 346, 352 (5th Cir. 1999) ("That Palmer may have missed one meal . . . does not rise to the level of a cognizable constitutional injury."); *Banks v. Superintendent*, No. 3:10-cv-150, 2011 WL 2604343, at *2 (N.D. Ind. June 30, 2011) ("Though missing this [one] meal was likely unpleasant, it did not violate the Eighth Amendment.").

Second, even if Mr. McMullen had shown that he was subjected to an objectively serious condition caused by a lack of safe or adequate food, his claims against Defendants would still fail because he has not presented evidence showing that Defendants were subjectively aware of such

a condition and disregarded the risk associated with it. The subjective standard "requires more than negligence and approaches intentional wrongdoing." *Goodloe v. Sood*, 947 F.3d 1026, 1030 (7th Cir. 2020) (internal quotation omitted). "[T]he evidence must show that the prison official . . . knew or was aware of—but then disregarded—a substantial risk of harm to an inmate's health." *Id.* at 1030–31. Mr. McMullen has not designated any evidence suggesting that Defendants were aware of a widespread problem with spoiled eggs or rotten fruit before March 6, 2020, and Director Bedwell has testified that he was not aware of any such problem. It is undisputed that Defendants knew about Mr. McMullen's rotten eggs after he complained about them on March 6 and that he received another pair of rotten eggs six weeks later. But Mr. McMullen has not designated any evidence that would allow a reasonable jury to infer that the second set of rotten eggs was caused by Defendants' deliberate indifference. For example, he has not designated any evidence showing that Defendants knew rotten eggs were being served on April 17, 2020, that many inmates complained to Defendants about rotten hard-boiled eggs, or that Defendants knew that there was a problem with the process for preparing hard-boiled eggs and ignored the problem. In addition, given the existence of the Replacement Tray Policy, there is no evidence from which a reasonable jury could conclude that Defendants knew that Mr. McMullen—or any inmate—would be exposed to a serious risk of harm if a rotten egg occasionally made it onto an inmate tray.

In his response, Mr. McMullen contends that he cannot avail himself of the Replacement Tray Policy in the morning because he does not eat breakfast in the chow hall. Dkt. 40 at 7. Even if the Court accepts this unverified statement as true, it does not help him because there is no evidence that *Defendants* knew that Mr. McMullen—or any inmate—was unable to request a replacement tray from correctional officers in accordance with the policy. Mr. McMullen also refers the Court to several affidavits from other inmates attesting to the presence of rats and rat

feces in the Wabash Valley kitchen. *See* dkt. 40 at 5–6. Defendants object that Mr. McMullen failed to disclose the affiants as witnesses in his initial disclosures and ask the Court not to review the affidavits. Dkt. 42 at 3. The Court will not resolve that objection here because, even assuming that there was a rat problem in the Wabash Valley kitchen and that Defendants knew about it, those facts do not help Mr. McMullen establish that they were subjectively aware of a problem with rotten eggs and fruit, which is unrelated to the alleged rat infestation.

In sum, Mr. McMullen has not created a genuine issue of fact on either prong, objective or subjective, of his deliberate indifference claims against Defendants. Accordingly, they are entitled to judgment as a matter of law.[3]

## IV.
## Conclusion

The **clerk is directed** to update the docket to reflect that Defendants should be identified as: (1) David Bedwell (currently identified as "D. Bedwell"); and (2) Brittany Smith (currently identified as "B. Smith"). For the reasons stated above, Defendants' motion for summary judgment, dkt. [34], is **granted**. This action is **dismissed with prejudice**. Final judgment will issue by separate entry.

**SO ORDERED**.

Date: 08/29/2022

JAMES R. SWEENEY II, JUDGE
United States District Court
Southern District of Indiana

---

[3] The Court notes that Mr. McMullen appears to raise retaliation claims in his summary-judgment response brief. *See, e.g.*, dkt. 40 at 7 (stating that he was moved from P-Housing Unit to restricted housing because he complained about his food). The Court does not address those allegations because they were not mentioned in the complaint, and—regardless—any such retaliation was carried about by IDOC employees, and Defendants are not liable for such actions.

Distribution:

HENRY TYWAN MCMULLEN, SR.
921738
WABASH VALLEY - CF
WABASH VALLEY CORRECTIONAL FACILITY - Inmate Mail/Parcels
Electronic Service Participant – Court Only

Christopher Douglas Cody
HUME SMITH GEDDES GREEN & SIMMONS
ccody@humesmith.com